DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Kennisha T., appeals from the decision of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her five minor children and placed them in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 I. {¶ 2} Appellant is the mother of five minor children: A.T., born October 3, 1996; J.T., born September 29, 1997; T.R., born December 16, 2000; L.T., born December 4, 2001; and Ar.T., born May 28, 2003. Paternity was not established for any of the children, and none of the alleged fathers is a party to this appeal.
 {¶ 3} CSB has had a significant history with the family. In a previous action, begun in 1998, the two oldest children were placed with a relative in 1999 and resided with her until January 2003, when the custodian relinquished custody due to her own health concerns. The children were returned to Appellant at that time.
 {¶ 4} The present action was initiated on March 24, 2004, when CSB, accompanied by the Akron police, went to Appellant's home to investigate a referral regarding the welfare of the children. According to CSB, the home was filthy, cluttered, and hazardous. Appellant agreed to a safety plan whereby she would clean the house, submit to a drug test within 24 hours, and allow the children to stay with a family friend until the home was safe.
 {¶ 5} Thereafter, CSB was unable to locate Appellant or her children. On March 31, 2004, CSB filed complaints in the juvenile court, alleging that the children were neglected and dependent and seeking emergency temporary custody. The order for emergency temporary custody was granted. Four of the children were located on April 23, 2004, and were taken into custody. The fifth child was later located and also placed in CSB custody.
 {¶ 6} On June 4, 2004, the trial court adjudicated the children as neglected and dependent. Notwithstanding Appellant's claim that she had complied with the safety plan, and that the home was in deplorable condition only because of the neglect of her landlord, the trial court found that Appellant had removed her children to West Virginia in violation of the safety plan and for the purpose of concealing them from CSB. The parties agreed to place the children in the temporary custody of CSB.
 {¶ 7} A case plan was adopted by the trial court and required Appellant to: (1) obtain and maintain independent, safe housing with space and furnishings for all the children for six months; (2) obtain a mental health evaluation and follow all recommendations, including a psychiatric assessment and psychotropic medications if recommended; (3) participate in weekly visitation and engage in a positive visiting experience with structured activities and good communication; (4) participate in a parenting class and demonstrate safe and effective parenting skills at visitation; and (5) complete drug and alcohol assessments and follow all recommendations, including random drug tests, counseling, and therapeutic treatment.
 {¶ 8} On March 16, 2005, CSB moved for a six-month extension of temporary custody because Appellant had complied with some of her case plan objectives, but had difficulty controlling her children at visitation and was not yet prepared to independently parent her children. On August 9, 2005, CSB moved for permanent custody of the children, while Appellant moved for legal custody.
 {¶ 9} Following a hearing, the trial court found that the children had been in the temporary custody of CSB for at least 12 of the prior 22 months and that permanent custody was in the best interests of the children. The trial court, therefore, terminated the parental rights of Appellant and placed the children in the permanent custody of CSB. The trial court denied all other dispositive motions.
 {¶ 10} Appellant timely appealed and assigned four errors for review.
 II. ASSIGNMENT OF ERROR I
"THE TRIAL COURT'S DECISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 11} Appellant contends that the weight of the evidence fails to support an award of permanent custody to CSB.
 {¶ 12} Before a juvenile court can terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C.2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and2151.414(B)(2); see, also, In re William S. (1996),75 Ohio St.3d 95, 97-99.
 {¶ 13} The trial court found that the first prong of the permanent custody test was satisfied because all five children had been in the temporary custody of CSB for at least 12 of the prior 22 months. Appellant does not contest that finding. She challenges only the best interest prong of the permanent custody test and contends that the trial court's finding on that issue was against the manifest weight of the evidence.
 {¶ 14} When reviewing the weight of the evidence, this Court applies the same test in civil cases as it does in criminal cases. Tewarson v. Simon (2001), 141 Ohio App.3d 103, 115. "The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Alterations sic). Id., citing Statev. Thompkins (1997), 78 Ohio St. 3d 380, 387, quoting State v.Martin (1983), 20 Ohio App. 3d 172, 175.
 {¶ 15} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C.2151.414(D)(1)-(4).[1]
Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. See In re Smith
(Jan. 2, 2002), 9th Dist. No. 20711, at *6; see, also, In rePalladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 16} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. Clear and convincing evidence is that which will produce in the trier of fact "a firm belief or conviction as to the facts sought to be established." In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 17} The first best interest factor requires the court to consider the children's interactions and interrelationships with others. Here, the children had relationships with each other, Appellant, and their foster families. There was little evidence of continuing relationships with extended family, and no positive relationship with any of the alleged fathers.
 {¶ 18} The five children shared a bond among themselves and enjoyed their visits together. They were all placed in separate foster homes, as they were too disruptive to be placed together. Most of the children have special medical and/or emotional needs. The oldest four children are boys, and the youngest is a girl.
 {¶ 19} The oldest child, A.T., had been diagnosed with attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, and a cognitive development disability. While living with Appellant, he was chronically truant from school. He has been in a therapeutic foster placement since July 1, 2004. When he came into care, A.T. began the school year in an inclusion classroom, i.e., a regular classroom with additional academic support for those who needed it. He also had a one-on-one teacher's aid. Nevertheless, A.T. had a difficult time academically, and his behavior was aggressive and violent. He would hit, bite, curse, threaten to bring a gun to school and kill people, and threaten to stab his counselor's eyes out and put a knife in her heart. He was suspended from school several times. His behavior was worse following visits with Appellant, as well as when visits were cancelled. His diagnosis was soon changed from cognitive delay to emotionally disturbed.
 {¶ 20} After threatening to kill the bus driver in November 2004, A.T. was suspended again and moved to Shipley's Day Treatment, a program designed to meet the needs of children who have severe emotional and behavioral problems and who cannot maintain in a regular school setting. At that time, A.T. was diagnosed with ADHD, oppositional defiant disorder, and posttraumatic stress disorder, the latter condition stemming from the trauma of violence between Appellant and Tommy Ragland, Appellant's paramour. He presented with significant anger issues and a history of sexualized behaviors. His behaviors were triggered by any mention of his mother or anyone else's mother. The school provided him with group, individual and family therapy. He was being treated with Resperdal as an antipsychotic, Concerta for ADHD, and Celeza for mood and anxiety.
 {¶ 21} According to Stacey Pancher, the mental health therapist at Shipley, A.T. expressed fear of violence reoccurring. He expressed love for his mother, but also for his foster family, and indicated that he wanted to be adopted by his foster mother. Pancher said A.T. immediately bonded with his foster mother and has made significant progress while in her home. The foster mother followed through with recommendations, had clear expectations, and set firm limits. Pancher said A.T. has also made excellent progress in the Shipley program. He is now friendly, pleasant, and follows classroom rules. He has become a role model in class and is preparing to return to a regular school setting next month. Pancher says he needs to be in a home with very clear boundaries and expectations, a high level of structure and good follow-through to monitor his medications and keep his many appointments with therapists and a psychiatrist.
 {¶ 22} A.T.'s foster mother also testified. She explained that A.T. is currently stable and doing very well. If permanent custody were granted, she would seek to adopt him.
 {¶ 23} The second child, J.T., has been in a regular foster home since December 3, 2004. He, too, has been diagnosed as having ADHD and possible bipolar disorder, as well as having disruptive behavior. He was also chronically truant from school while living with Appellant. J.T. participates in weekly counseling with Christine Miley at Child Guidance and Family Solutions. Miley was concerned that J.T. indicated Appellant advised him to misbehave. Miley testified that J.T. loves his mother, misses her and wants to go home with her. However, Miley also said that children typically want to return to their parents. In addition, Miley testified that J.T. has been improving steadily in school and is now doing very well. He is also doing well in counseling because of his consistent attendance. He needs stability in his life, and his current placement provides him with the structure and consistency he needs. Changing schools or his home environment now would be a difficult adjustment. She advised that J.T. should not return to an environment of domestic violence.
 {¶ 24} Alma Houston, M.D., a child psychiatrist at Child Guidance and Family Solutions, saw J.T. to monitor his medications. He is being treated with Adderall to help focus attention, Seroquel to slow his mood swings, and Clonidine to help him sleep. Houston confirmed that he is doing much better. Houston said J.T. needs a stable home with limits, someone to administer medications on a regular basis, and provide consistency in attending appointments. He needs a home where he will be taught not to lie, steal and disobey the foster parents. She believed that J.T.'s problems stemmed, in part, from poor living conditions and physical and emotional neglect.
 {¶ 25} The third child, T.R., is five years old. He is also placed in a therapeutic foster home through Ohio Mentor. He suffers from Hirschsprung's Disease, also known as short gut syndrome, and requires a special diet which includes high fiber and no sweets or desserts. He has some symptoms of ADHD, has problems with his teeth, and receives fine motor therapy and physical therapy for his stomach muscles. Behaviorally, he has been verbally and physically aggressive and has lacked appropriate boundaries with strangers. His foster parents monitor his diet closely and provide consistency, structure, appropriate discipline, love and nurturing. A case manager from Ohio Mentor affirmed that T.R. gets along well with his foster parents and that he has improved while in foster care. He attends a school for children with special needs and is also in counseling. His therapist testified that T.R. said he does not love his mother and would like to kill her. The foster parents reported that they have encouraged T.R. to love his mother and family, but that he has indicated he would like to remain with his foster parents. They also reported that T.R.'s behavior escalated after visits with Appellant and that Appellant has not adhered to T.R.'s dietary guidelines in the snacks she brings to visits.
 {¶ 26} L.T. is four-years-old. He has been expelled from three daycare situations because of his behavior and has recently been placed in his fourth foster home. His behavioral issues are significant and have evolved into sexual issues as well. He is currently in a Head Start program.
 {¶ 27} The youngest child, Ar.T., is two and one-half years old and has been in a relative placement since July 13, 2004. She participates in the Help Me Grow program for speech therapy. She is said to have a good relationship with the other children in the foster home. If permanent custody were awarded, her caregiver would be interested in adopting her. She is not willing to assume legal custody. She stated that she would be concerned with Ar.T.'s safety if she were returned to Appellant and the home situation were not changed.
 {¶ 28} Appellant testified that she loves her children, and, to her credit, she regularly traveled from Beckley, West Virginia to participate in weekly visitations. She frequently brought them gifts. Appellant, however, was unable to handle all five children at visitation, and the children were divided into two groups. The visits also had to be moved to a separate site because Appellant's visits were disruptive to other families trying to conduct visits at the same time. Appellant's visits never progressed beyond the level of supervised visits. The visitation supervisor, CSB caseworker, and CSB supervisor all testified that Appellant's visits with her children were chaotic and lacked any control.
 {¶ 29} Appellant's parenting evaluation indicated that she did not have the necessary skills to adequately care for her children. The evaluation further indicated that Appellant tended to blame others for her problems and lacked insight that would allow her to effectively parent her children. Even after attending parenting classes and receiving guidance from several service providers, she demonstrated no improvement in her parenting style or habits during visits. Appellant repeatedly brought cakes and candy and purchased candy bars from the machines for her children, despite being instructed to bring healthy snacks for T.R. The visitation supervisor even prepared a bag of healthy snacks for Appellant to give to her children and left them at the visitation site, but Appellant did not use them. The visitation supervisor, CSB caseworker, and CSB supervisor all expressed concern as to whether Appellant had the ability to care for her children.
 {¶ 30} Appellant's case plan included an objective addressing substance abuse. Drug screening revealed positive test results for marijuana on March 25, 2004, October 18, 2004, and February 10, 2005. Additional positives were consistently found in weekly tests from July 7, 2005 until September 8, 2005. Appellant contends that these results represented the residual effects from only one accidental use, but CSB presented uncontroverted evidence that the residual effect of a small amount of marijuana would last only a few days, whereas long-term use can result in positive tests for up to two months.
 {¶ 31} CSB caseworker Lawanna Humphrey expressed concern regarding Appellant's relationship with Tommy Ragland, Appellant's paramour and a father figure to the children. Ragland had been involved in several domestic violence issues with Appellant, and Humphrey believed this relationship negatively impacted the safety of the children.
 {¶ 32} Patricia Sullivan, cousin of Appellant, explained that she had assumed legal custody of the two oldest children in 1999, upon learning that they were "up for adoption." She had custody of the children for almost four years. Sullivan explained that Appellant interacted with her children as a child when she visited. She did not always visit at appropriate times, provided snacks before dinner, kept the children up past their bedtimes, and shared inappropriate information with them. According to this witness, Appellant accused Sullivan of trying to turn the children against her. Sullivan relinquished custody when she found she was no longer able to continue to care for the children. She believes that Appellant has matured and that it would be good for her to live with the children in West Virginia where she has other relatives.
 {¶ 33} For her part, Appellant generally denied or attempted to excuse all negative implications from her behavior. She testified that she is employed as a hairdresser, yet provided no proof of employment or financial resources. She claimed all her positive marijuana test results stemmed from accidentally smoking a friend's cigarette on one occasion. At the same time she admitted using marijuana recently because she has been depressed and feels as though no one is listening to her. She claimed she does not need additional parenting classes or substance abuse treatment. She claimed she has no mental health problems, yet sees a psychiatrist and takes several prescribed medications. She attempted to dismiss any negative implications from a public intoxication citation, as well as domestic violence incidents with Tommy Ragland in the spring of 2005 and October 2005. She also attempted to diminish responsibility for a 2000 drug charge and denies being convicted in 1999 for interference with custody in the last CSB case. She claims she does not know why her two oldest children were removed from her care in 1999.
 {¶ 34} As to the relationship of the children with their foster families, caseworker Humphrey testified that there was good and appropriate interaction in all cases.
 {¶ 35} None of the alleged fathers made any effort to comply with the case plan or to demonstrate a positive relationship with the children.
 {¶ 36} Except for obtaining housing, Appellant has failed to comply with the balance of her case plan. She participated in one set of parenting classes, yet has not been able to demonstrate any improvement in her parenting skills. After one and one-half years, Appellant is still in the early stages of compliance with her mental health objective. Appellant is currently receiving psychiatric services and counseling, yet has missed several recent appointments. She has failed to comply with the follow-up for chemical dependency treatment, and there is continuing concern about drug and alcohol abuse.
 {¶ 37} As to the second best interest factor, Patricia Harris, the guardian ad litem expressed her strong belief that permanent custody was in the best interests of all five children. She based her conclusion that Appellant was not able to provide a safe, stable home for the children on her observations that all the boys shared similar stories and had similar violent tendencies. She also indicated that J.T. did not initially want to return home, but she believed he would currently say he wanted to return to his mother.
 {¶ 38} Third, the custodial history of the children reflects that Appellant became involved with CSB in 1998, upon allegations of neglect of her two oldest children, A.T., then less than two years old, and T.R., then less than one year old. Case plan objectives at that time included housing, mental health, and drug and alcohol abuse — similar to the issues in the present case. CSB eventually moved for permanent custody, but a relative, Patricia Sullivan, volunteered to take legal custody in August 1999, just before the permanent custody hearing was set to begin. The two children remained in the custody of Sullivan until January 2003, when she was no longer able to provide for their care. The children were returned to Appellant at that time.
 {¶ 39} The present action began fourteen months later, in March 2004. All five children were adjudicated neglected and dependent in June 2004. They have remained in foster care since that time. The two oldest children have lived away from Appellant for nearly five of their eight and nine-year lives. All of the children except young Ar.T. have been in multiple foster homes because of their aggressive behaviors.
 {¶ 40} Fourth, there was evidence before the trial court that supported its conclusion that the children's need for a secure permanent placement could only be met by a grant of permanent custody to the agency. No suitable relatives were willing to assume legal custody.
 {¶ 41} CSB Supervisor Sharon Snyder testified that she believed the best interests of the children were that they be placed in the permanent custody of the agency. She explained that Appellant had made little progress on her case plan and there was no improvement in visitations. At the same time, the children had made tremendous progress in foster care.
 {¶ 42} Caseworker Lawanna Humphrey testified that the children needed permanency in their lives. She believes the children need an environment that provides stability and addresses their mental health, educational needs, and medical needs on a consistent basis. She supports a placement of permanent custody because she has not observed Appellant applying anything that she may have learned in parenting classes or regarding chemical dependency issues.
 {¶ 43} Guardian ad litem Harris also advocated for permanent custody. She wrote three reports throughout the course of her one and one-half year service in this case and interviewed all the children. She made 71 contacts with children, parents, CSB employees, and service providers, and made 141 visits to foster homes, schools, and the visitation center. Ultimately, she expressed her strong belief that the children should be placed in the permanent custody of CSB. She does not believe the four boys have ever experienced any stability with Appellant and does not believe Appellant has taken any responsibility for the many issues her children have despite being challenged to do so. The guardian ad litem conceded that while the changing placements of the children may have exasperated issues, there is too much similarity in what the boys have said, their knowledge of drugs, and in how they act out in violence and aggression to avoid the conclusion that Appellant must bear responsibility for the severity of their problems.
 {¶ 44} The guardian ad litem explained that she investigated Appellant's repeated allegations of mistreatment of the children while they were in their foster homes. She visited the foster home or school to see the child involved, but never found the same story as Appellant alleged. CSB witnesses testified similarly that they investigated Appellant's many allegations, but that none was substantiated. CSB service providers further indicated that these allegations often preoccupied much of Appellant's visitation time.
 {¶ 45} The guardian ad litem testified that A.T. has made a tremendous turnaround while in foster care. While A.T. was very physically and verbally violent when he came into care, he now has strategies for dealing with his anger without aggression. He is bonded to his foster mother. The guardian ad litem explained that A.T.'s bond with his mother reflects more of a responsibility to protect her than a typical child-parent bond.
 {¶ 46} The guardian ad litem reported that J.T. proudly displayed his many scars from fighting with his brothers. She related that J.T. was initially ambivalent and not at all desirous of going home. Now, she believes he would say that he wanted to return home.
 {¶ 47} The guardian ad litem reported that she gave a list of T.R.'s dietary needs to Appellant, but Appellant did not follow it. This not only created problems for the foster family, but also created a great deal of discomfort for the child. She said that T.R. was very bonded to his foster family and does not speak much about his mother.
 {¶ 48} Four-year-old L.T. has significant behavioral issues. He misses his brothers, but has not said much about his mother.
 {¶ 49} Two-year-old Ar.T. was removed from her home at a young age, and has become very bonded to her caregiver. She does not appear to have any special needs beyond speech therapy.
 {¶ 50} The guardian ad litem observed several visits between Appellant and the children and stated that they are very chaotic. Appellant tries to express love and caring, but the children are too busy running around. According to the guardian ad litem, Appellant does not have the skills or ability to control the children. She stated that Appellant does not display age-appropriate boundaries for her children and has not successfully completed the case plan. According to the guardian ad litem, Appellant does not seem concerned with how her behaviors affect her children.
 {¶ 51} Given the evidence before the trial court, this Court cannot say that the trial court lost its way in concluding that permanent custody to CSB was in the best interests of the children. Appellant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II
"THE TRIAL COURT ERRED AS A MATTER OF LAW BY FAILING TO [CONSIDER] THE ALTERNATIVE DISPOSITION OF A PLANNED PERMANENT LIVING ARRANGEMENT."
 {¶ 52} Appellant contends that the trial court erred in failing to consider placing the children in a planned permanent living arrangement ("PPLA") instead of granting permanent custody to CSB. The argument is without merit.
 {¶ 53} Appellant has cited a decision of this Court, In reA.S., 163 Ohio App.3d 647, 2005-Ohio-5309, in support of her claim. In that case, this Court considered whether the juvenile court erred when it sua sponte ordered a child to be placed in a PPLA when CSB never requested that disposition. A majority of this Court found that the juvenile court did not err in so doing. Id. at ¶ 42. That decision is currently before the Ohio Supreme Court upon certification of a conflict between appellate districts on that issue. See In re A.S., 108 Ohio St.3d 1410,2006-Ohio-179. Our decision in that case, however, is not dispositive of the question presently before this Court. Regardless of whether or not a juvenile court has the authority to order a child to be placed in a PPLA when CSB has not requested that disposition, such decision will not control the question of whether the juvenile court must explicitly state that it has considered the alternative of PPLA before entering a decision to terminate parental rights.
 {¶ 54} As part of its best interest determination, it is true that the juvenile court is obligated to consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(4). In the present case, the trial court specifically found that "[n]o alternatives to permanent custody exist to assure the minor children a safe, secure permanent placement." In so doing, the trial court, implicitly determined that alternative dispositions, such as PPLA, were not appropriate. The failure of the trial court to mention PPLA in its decision, does not mean that the trial court did not consider that as an option, nor does it constitute error. Appellant's second assignment of error is overruled.
 ASSIGNMENT OF ERROR III
"THE JUVENILE COURT COMMITTED PLAIN ERROR BY FAILING TO APPOINT INDEPENDENT COUNSEL FOR THE MINOR CHILDREN."
 {¶ 55} In her third assignment of error, Appellant contends that the trial court committed plain error by failing to appoint independent counsel for the minor children. Appellant premises her argument that independent counsel should have been appointed for the children on her claim that there was a conflict between the wishes of the children and the recommendation of the guardian ad litem. She argues that upon learning of this purported conflict, the trial court should have inquired further and appointed counsel for the children. We disagree.
 {¶ 56} Appellant cites to the recent Supreme Court decision in In re Williams, 101 Ohio St.3d 398, 2004-Ohio-1500, in support of her claim. In that case, the Ohio Supreme Court held that, "[p]ursuant to R.C. 2151.352, as clarified by Juv.R. 4(A) and Juv.R. 2(Y), a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel incertain circumstances." (Emphasis added.) Williams,2004-Ohio-1500, at syllabus.
 {¶ 57} The Williams court did not explain what circumstances might trigger the juvenile court's duty to appoint counsel. See In re Wylie, 2d Dist. No. 2004CA0054,2004-Ohio-7243, at ¶ 70. However, the facts of Williams may give some guidance. The facts of Williams indicate that the child whose custody was at issue was four years of age at the time he was initially placed in the temporary custody of the child protective agency. Williams at ¶ 2. He was subsequently returned to his mother, removed again, and was six years of age at the time the permanent custody hearing was conducted.Williams at ¶ 4. The child was represented by a guardian ad litem, who was an attorney, but was not appointed to represent the child in a dual capacity. In re Williams, 11th Dist. Nos. 2002-G-2454, 2002-G-2459, 2002-Ohio-6588, at ¶ 20. The child was said to have "repeatedly expressed a desire to remain with his mother," and the guardian ad litem recommended that permanent custody be granted to the agency. Williams, 2004-Ohio-1500, at ¶ 5.
 {¶ 58} In holding that a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore is entitled to independent counsel in certain circumstances, the Williams court approved of the court of appeals' recognition that "courts should make a determination, on a case-by-case basis, whether the child actually needs independent counsel, taking into account the maturity of the child and the possibility of the child's guardian ad litem being appointed to represent the child." Id. at ¶ 17.
 {¶ 59} The appeals court in Williams emphasized that the child expressed his wish for reunification "often," "consistently," and "repeatedly." Williams, 2002-Ohio-6588, at ¶ 17, ¶ 20, and ¶ 9. He "often did not want to let appellant out of his sight." Id. at ¶ 9. Significantly, the appellate court recognized that "there is no need to consider the appointment of counsel based upon a child's occasional expression of a wish to be with a parent or because of a statement made by an immature child." (Emphasis added.) Williams, 2002-Ohio-6588, at ¶ 24.
 {¶ 60} In the present case, Appellant asks this Court to recognize the trial court's failure to appoint independent counsel for the children as plain error. She contends that independent counsel should have been appointed because the wishes of the children were in conflict with the recommendation of the guardian ad litem. In support of her claim that the wishes of the children conflicted with the recommendation of the guardian ad litem, Appellant points to a pre-trial order and testimony regarding the two oldest children.
 {¶ 61} In reviewing the evidence to which Appellant has pointed, we conclude that virtually all of the statements, including those that A.T. and J.T. loved their mother, were bonded with her, missed her when she did not come to visitations, or even expected to be returned to her do not constitute evidence that the children had an affirmative desire to return to their mother's home and live with her on a permanent basis. The desire to see one's parent does not equate to a desire to remain in the parent's household. In re G.C., 8th Dist. No. 83994,2004-Ohio-5607, at ¶ 9. This is so because "the presence of parent/child bonding is not the same thing as making a knowing choice to remain with one parent." In re M.W., 8th Dist. No. 83390, 2005-Ohio-1302, at ¶ 12. Nor are such statements, therefore, in conflict with a recommendation for permanent custody by a guardian ad litem. See In re J.B., 8th Dist. No. 85489, 2005-Ohio-4827, at ¶ 20;
 {¶ 62} Here, the only evidence to which Appellant points that suggests either child has expressed a wish to return to live with his mother is the testimony of Harris, the guardian ad litem; and that of Christine Miley, an outpatient therapist at Child Guidance and Family Solutions. The guardian ad litem in fact testified that J.T. was initially very ambivalent about his mother and not at all desirous of going home. However, at the time of the hearing, she believed J.T.'s "stated goal would be to go home." The guardian ad litem also strongly recommended that all five children should be placed in the permanent custody of CSB. Miley, who only began working with J.T. in June 2005, testified that J.T. loves his mother and "has expressed that he wants to go home with her." She also stated that, in her experience, children typically say they want to return to their families.
 {¶ 63} Moreover, the record fails to suggest that J.T. had the necessary maturity to understand the proceedings and provide a credible indication regarding his wishes as to custody. He is being treated for ADHD, bipolar disorder, and disruptive disorder. He is in counseling and under psychiatric care.
 {¶ 64} In sum, this record does not support a conclusion that A.T. ever affirmatively expressed a desire to return home,[2] nor does it support a conclusion that J.T. consistently and repeatedly expressed such a desire, as was the case with the child in Williams.
 {¶ 65} Based upon the lack of a consistent expression of a desire for reunification, J.T's lack of maturity to understand the proceedings, and the overwhelming evidence supporting the trial court's findings that the children's best interests would be served by awarding custody to CSB, we do not conclude that the trial court erred in failing to appoint independent counsel for minor children. The third assignment of error is overruled.
 ASSIGNMENT OF ERROR IV
"APPELLANT WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF HER TRIAL COUNSEL."
 {¶ 66} Appellant next contends that her trial counsel was ineffective for failing to object to certain hearsay statements, for failing to request the alternative disposition of PPLA, and for failing to request independent counsel for the children.
 {¶ 67} In evaluating an effective assistance of counsel claim, this Court must determine whether counsel's performance fell below an objective standard of reasonableness, and whether prejudice resulted from counsel's ineffectiveness. State v.Bradley (1989), 42 Ohio St.3d 136, at paragraph two of the syllabus. Prejudice exists where the trial result would have been different but for the alleged deficiencies of counsel. Id. at paragraph three of the syllabus. Claimant bears the burden of proof and must show that "counsel's errors were so serious as to deprive [the party] of a fair trial, a trial whose result is reliable." Strickland v. Washington (1984), 466 U.S. 668, 687. Moreover, claimant must overcome the presumption that a properly licensed attorney is competent, State v. Calhoun (1999),86 Ohio St.3d 279, 289, as well as the presumption that the challenged action constitutes trial strategy. State v. Carter
(1995), 72 Ohio St.3d 545, 558.
 {¶ 68} Appellant in the present case must, therefore, demonstrate not only that her trial counsel committed error as indicated, but also that the result of the permanent custody hearing would have been different but for that error.
 {¶ 69} The purported hearsay statements of which Appellant complains included (1) statements by A.T. that he had to help take care of his brothers and sister when he went home and that he had to stand up for his mother against Tommy Ragland; (2) statements by T.R. that his brothers were teaching him how to fight, that he did not love his mother, and that he called her a "b____;" (3) statements by A.T. that he had witnessed domestic violence and pornography, and had smoked cigarettes in the home; (4) statements by A.T. that he had stolen items from neighborhood homes while living with Appellant; (5) statements by J.T. that he took pride in his many scars, that Appellant failed to provide him with medical treatment for a burn, that he witnessed violence between Tommy Ragland and another girlfriend, and that Appellant had to be with men at night to earn money for the family; and (6) a statement by J.T. that his mother told him it was his job to get into fights and cause enough trouble that they will send him back home.
 {¶ 70} Appellant argues that these statements were prejudicial because they suggested that Appellant was involved in domestic violence, that Appellant was improperly supervising visitation, and that Appellant lacked the parenting skills necessary to provide a safe, secure environment for the children. Appellant has not argued, however, that these matters were not otherwise established by fully admissible evidence or that the result of the trial would have been different absent the cited statements.
 {¶ 71} Without deciding whether each of these statements constitute inadmissible hearsay, it appears that the only matter relied upon by the trial court in reaching its decision is the fact that the children had been exposed to frequent incidents of domestic violence in their home. That fact was well established by other evidence and the trial court did not need to rely on statements by the children in order to properly consider it. Otherwise, it does not appear that any of the other challenged statements were relied upon by the trial court in coming to its decision. Appellant has failed to demonstrate that, without the introduction of these statements, the outcome of the permanent custody hearing would have been different.
 {¶ 72} Appellant also claims that her trial counsel was ineffective in failing to object to testimony by Lawanna Humphrey, a caseworker for CSB, regarding the deplorable housing conditions which existed in March 2004 when the present case was initiated. Appellant contends that this testimony was relevant only to the previous adjudication of neglect and is not relevant to the present issue of permanent custody. However, facts regarding the previous condition of Appellant's home remained a matter of record in the present case, and were available to the trial judge before whom the case was tried. Furthermore, those facts continued to serve as a benchmark for the trial court's evaluation of any progress Appellant might have made on her case plan. We do not find that failure to object to this testimony was prejudicial.
 {¶ 73} Finally, Appellant asserts that trial counsel's failure to request the alternative disposition of PPLA and failure to request independent counsel for the children constituted ineffective assistance of trial counsel. Appellant, however, fails to specifically argue how this performance fell below an objective standard of reasonableness and also fails to establish that the result would have been different, but for the alleged deficiencies of counsel. See Bradley,42 Ohio St.3d at 141-42. Consequently, we need not further address this portion of this assignment of error. See App.R. 16(A)(7) and App.R. 12(A)(2). We note, however, that we have overruled other arguments based upon the substantive merits in these two claimed errors. See discussion under Assignments of Error II and III. The fourth assignment of error is overruled.
 III. {¶ 74} Appellant's four assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Slaby, P.J., Whitmore, J., Concur.
[1] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.
[2] In fact, the only specific testimony on this question is to the contrary. Stacey Pancher, A.T's mental health therapist, testified that A.T. would like to be adopted by his current foster mother.