[Cite as *In re M.A.P.*, 2023-Ohio-1755.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                |   | JUDGES:                      |
|----------------|---|------------------------------|
| IN RE:         | : | Hon. W. Scott Gwin, P.J.      |
| M.A.P          | : | Hon. William B. Hoffman, J.   |
| A.B.S.         | : | Hon. Andrew J. King, J.       |
| T.E.S.         | : |                              |
| A.E.S          | : | Case No.      22CA0024        |
|                | : |               22CA0025        |
|                | : |               22CA0026        |
|                | : |               22CA0027        |

OPINION

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Coshocton Court of Common Pleas, Case Nos.20203027, 20203028, 20203029, & 20203029 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | May 24, 2023 |

APPEARANCES:

| For- Appellee | For-Mother |
|---|---|
| ASHLET JOHNS | DEBORAH FRIES |
| Coshocton JFS | 2760 Oxford Drive |
| 725 Pine Street | Nashport, OH 43830 |
| Coshocton, OH 3812 | |

*Gwin, P.J.*

**{¶1}** Appellant-mother ["Mother"] appeals the August 8, 2022 Judgment Entry of the Coshocton County Court of Common Pleas, Juvenile Division that terminated her parental rights with respect to her minor children M.A.P. and A.B.S. and granted permanent custody of the children to appellee, Coshocton County Department of Jobs and Family Services ["CCJFS"], and, which granted legal custody of her minor children T.E.S. and A.E.S. to T. K.[1]

*Facts and Procedural History*

**{¶2}** Mother to all children is A.S. Father to M.A.P. is M. P. Father to A.B.S. is listed on the birth certificate as J.C.; however, the biological father is believed to be J. D. The juvenile court found J.C. to be the legal father of A.B.S. according to the State of Ohio, Office of Vital Statistics, State File Number 2018133498, filed December 21, 2018. A.S. is the father of the twins, T.E.S. and A.E.S.

**{¶3}** On March 16, 2020, CCJFS received a report with allegations of substance abuse, lack of stable housing, and physical aggression as it relates to Mother. Before this report could be investigated, CCJFS received a report that Mother, while attempting to flee from a domestic violence situation, improperly secured the children in her car. This resulted in A.B.S. falling out of the vehicle and being run over by a vehicle traveling behind Mother's car. A.B.S. was life-flighted to the hospital with severe injuries. Three siblings were also in the vehicle, M.A.P., A.E.S. and T.E.S. They were also taken to a hospital, evaluated, and released. They were found to have respiratory illnesses. Mother

---

[1] See, OH ST Supp. R. 44(H) and 45(D) concerning the use of personal identifiers.

(passenger) and F. C. (driver and alleged paternal uncle to one of the children) were arrested upon felony charges of Child Endangerment.

**{¶4}** The trial Court noted in the entry filed March 18, 2020, that Mother, at the Shelter Care Hearing, stated that J. C. was not the biological father of A.B.S. She further stated that J. D., residing in Houston Texas, is the biological father of the child.

**{¶5}** On June 4, 5, and 11, 2020, the court held adjudicatory and dispositional hearings. M.A.P. was found to be dependent and neglected; A.B.S. was found to be abused, neglected and dependent; T.E.S. and A.E.S. were determined to be dependent based upon evidence of their improper restraint in a vehicle.

**{¶6}** On August 5, 2020, Mother and J. C. applied and received a marriage license at Coshocton County Probate Court (Void after 60 days), which license was not returned to the Court.

**{¶7}** On September 17, 2020, CCJFS filed a Motion to Change Custody of T.E.S. and A.E.S. to T. K., a non-relative kinship placement. A Motion to Submit Sensitive Material Under Seal, Home Study for T. K. was filed on the same date. The juvenile court granted the motion pertaining to sensitive material on September 18, 2020.

**{¶8}** On October 5, 2020, the court granted temporary custody of T.E.S. and A.E.S. to non-relative kinship provider T.K., and protective supervision to CCJFS.

**{¶9}** On December 16, 2020, CCJFS filed a Motion to Submit Mother's Psychological Evaluation under seal which was granted on the same date.

**{¶10}** On December 29, 2020, Mother and A.C. applied and received a marriage license at Coshocton County Juvenile Court. Mother and A.C. married on the same date based on Information on the returned license. *See*, GAL Exhibit 11.

{¶11} On February 17, 2021, CCJFS filed a Motion for a Six-Month Extension.

{¶12} On April 5, 2021 the Annual Court Review was held. The juvenile court found Mother was charged and convicted of Child Endangering, a felony of the third degree due to injuries suffered by A.B.S. She served forty-six days at the Coshocton County Justice Center and had been sentenced to three years community control sanctions. She is currently in compliance with probation. Mother is residing at Chestnut Crossing where she has secured a three-bedroom apartment since December 2020.

{¶13} On July 7, 2021 Mother filed a motion to join J. D. as a party to the case regarding the child A.B.S., which was denied by the court.

{¶14} On September 3, 2021, CCJFS filed a Motion for Permanent Custody of M.A.P. and A.B.S., as well as a Motion to Change Custody of T.E.S. and A.E.S. to T.K.

{¶15} On November 2, 2021, Mother filed a motion to clarify the motion to join J.D. as the Father of A.B.S.

{¶16} The permanent custody and legal custody motions were heard by the juvenile court on the following dates: January 4, 2022; January 5, 2022; February 24, 2022; March 3, 2022; March 9, 2022; March 16, 2022; March 23, 2022; March 24, 2022; March 25, 2022; March 28, 2022; April 11, 2022; and, April 21, 2022.

{¶17} On January 5, 2022, Mother filed a motion to Appoint a Separate Guardian ad Litem. A Motion for In-Camera Interview of M.A.P. was filed by the GAL on January 5, 2022[2].

---

[2] The GAL subsequently withdrew the motion.

**{¶18}** On March 22, 2022, Mother filed a Renewed Motion for Independent Observation of Mother's Supervised Visits and Motion to Continue the Final Hearing Date for Mother's Case Until Six Weeks of Independent Observation Have Taken Place.

*Permanent Custody Hearings*

**{¶19}** Kaylee Shalosky, former CCJFS caseworker testified concerning the accident and injuries to A.B.S. Ms. Shalosky further testified that Mother did not provide contact information for J.D. 1T. at 108. Ms. Shalosky investigated relative placement for the children; however, none were either willing or deemed suitable to care for the children. 1T. at 41-47.

**{¶20}** Trooper Tyler McKee, Ohio State Highway Patrol, testified regarding a traffic stop of the Mother on April 26, 2019 at approximately 10:30 pm, for a marked lane violation and excessive speed. 1T. at 129. The two older boys were not properly belted in, Mother was not properly belted in, and Mother appeared impaired base on her bloodshot eyes and dilated pupils. Id. at 129-130. Mother admitted smoking marijuana earlier. Mother denied any marijuana was in the vehicle; however, when asked if any was in the diaper bag, she retrieved a small quantity from the bag. 1T. at 130. Trooper McKee performed field sobriety tests on Mother. Mother was charged with Operating a Vehicle While Impaired, not having a valid operator's license, a marked lanes violation, child endangering and marijuana possession. Id. at 133-135.

**{¶21}** Deputy Hannah LaBorde, Ruston Police Department, Ruston, Louisiana, testified regarding an incident involving the Mother and Father A.S. occurring December 28, 2019. 1T. at 172. She responded to an incident in a standby capacity, observed Mother to be pregnant, and observed a bruise to Mother's abdominal area. Id. at 173.

Mother reported that Father A.S. was intoxicated, struck her several times in the abdominal area, held a knife to her stomach, that she was in fear, and that there were children present for the incident. 1T. at 175. Officer LaBorde reported other incidents with the couple to which she responded and offered victim services to the Mother, which were not followed through with by Mother. 1T. at 181-182; 187; CCJFS Exhibit 8.

{¶22} Deanna Lanham, CCJFS Caseworker, testified that she assumed the case in October 2020. 2T. at 216. The twins were placed with T.K. Id. at 217. Mother was required to receive an assessment at Coshocton Behavioral Health Choices and follow all recommendations. 2T. at 221-222. Mother was to submit to random announced and unannounced drug screens and to develop sober supports. Mother was to engage at First Step in regard to past violent relationships, maintain housing and employment. 2T. at 222. Mother was further required to demonstrate the ability to manage all four children, and follow all the terms of her community control. Id. Mother was required to follow the recommendations of Dr. Wolfgang.

{¶23} Mother was employed at that time. 2T. at 224-225. She completed her assessment at Coshocton Behavioral Health Choices. Id. at 225. Mother received counseling services from Jane Engott and was utilizing Coshocton Behavioral Health Choices for sober support. Id. at 226. Mother completed an assessment with Dr. Wolfgang. Id. Mother was seeing all four of her children twice per week. Id. at 227.

{¶24} During a home visit on February 24, 2021, Mother expressed her frustration with CCJFS. 2T. at 243. She refused to sign an amended case plan at that time. Id. at 244. Mother further indicated that because she is paying child support, she should not be required to provide any items for the children. Id. at 243.

{¶25} In July 2021, Mother tested positive for THC. 2T. at 253. Mother admitted to smoking marijuana at a birthday party. 2T. at 254. Mother's visitation with the children was suspended for three months. Id. at 255. Visitation resumed in October, 2021. 2T. at 256. The children were much more resistant to Mother. 2T. at 258-261. She needed assistance to manage the twins. Ms. Lanham testified that she has never observed Mother being able to manage all four children. Id. at 261.

{¶26} Ms. Lanham testified that Mother was not required to complete or provided with parenting classes. 2T. at 262; 329-330. Rather, she received "coaching through her visits." Id.

{¶27} On cross-examination, Ms. Lanham testified that the foster parents had difficulty with M.A.P. and A.E.S. 3T. at 346. In fact, those two children had been in seven different placements. Id. at 351. It was not alleged that Mother had used marijuana in the presence of any of the children. It was further not alleged that Mother had been under the influence of non-prescribed medication or drugs during any of her visits with the children. Mother completed eleven of the fourteen case plan objectives. 4T. at 513. Mother continually engaged in the services recommended by CCJFS. Id. at 515. Mother utilized the medical providers, psychiatric providers and the rehabilitative services provided to her. Id. at 516. Mother continually attended visitations with the children. Id. at 518.

{¶28} Sara Jacobs Lusk, visitation supervisor with Coshocton County Family and Children's First Council (FCFC) testified regarding Mother's supervised visits with the children from November 23, 2020 to November 2021. Ms. Lusk's notes concerning

her observations at Mother's visitations were admitted into evidence during the hearing. *See*, CCJFS Exhibits 11, 12, 15, 19-23; 26; 28; 30-33; 35-37; 40 & 41.

**{¶29}** As designed, the supervised visitation program consisted of a pre-visit advice session, the supervised visit with coaching, and a post-visit session. The services were reduced to only a supervised visitation program due to the Mother's unwillingness to accept suggestions or advice and unwillingness to engage with Ms. Lusk. 4T. at 530-531. Coaching services were stopped June 24, 2021 due to Mother's refusal to engage with FCFC employees. Id. at 530. Ms. Lusk testified that she has not observed any improvement in Mother's ability to supervise the children. 4T. at 555. She further testified that supervised visitation and coaching have not improved Mother's parenting abilities. Id. Ms. Lusk did note that Mother changes the children, feeds them, tells them she loves them and plays with them during her visits. 4T. at 562-563. Overall, Ms. Lusk found Mother to be distracted during the visits, unwilling to accept suggestions or advice during the period such services were part of Mother's program, unable to provide for the children's basic needs, lacking in attachment or bonding with the children, unable to maintain the children safely, and difficult to supervise.

**{¶30}** Ms. Lusk was recalled as a witness to testify regarding more recent visits of the Mother, and in particular, the visit of March 21, 2022. This visit had been terminated early by FCFC due to difficulties of the Mother supervising the children, who were behaving poorly, which difficulties were escalated by the Mother's reaction and conduct, and culminated in the Mother yelling profanities at the FCFC staff in the presence of the children, who were visibly shaken by the outburst. 11T. at 1612-1614; 1614-1619.

**{¶31}** T.K. testified regarding kinship placement for T.E.S. and A.E.S. T.K. testified to her experiences with the children. T.K. testified that she became aware of Mother because T.K.'s ex-boyfriend and his sister knew Mother. 7T. at 990. She contacted CCJFS and told them she had watched the boys before and she would help out if needed.

**{¶32}** Gary Wolfgang, PhD, testified that he is retired. 8T. at 1108. Dr. Wolfgang testified that he does not use psychological tests as a diagnostic tool. 7T. at 1058; 8T. at 1139-1140; 1154-1155; 1199. Instead, he relies on a psychosocial history interview, a clinical interview, and a mental health status exam. Id. He spoke to the Mother, the caseworker, and the two foster parents in drawing his conclusions. 8T. at 1160. Dr. Wolfgang did not consult any medical or psychological providers of the children. Id. Dr. Wolfgang has not reevaluated Mother since August, 2020. 8T. at 1189. Dr. Wolfgang formed his opinions on the basis of,

> [A] very thorough four-part interview that included a very thorough and detailed psychosocial history. During the entire period, I observed her behaviors for the presence of psychological symptoms. I also reviewed all materials forwarded to me and quite recently observed interactions of the various parties of the children.

8T. at 1199. Dr. Wolfgang testified regarding Mother's evaluation, providing information on his process, records reviewed, observations made during the four interviews and his summary and recommendations as documented in his report dated December 4, 2020. CCJFS Exhibit 7. He found Mother's difficulties to be chronic and confirmed a diagnosis of Post-traumatic stress disorder. Dr. Wolfgang did not agree with a diagnosis of bipolar

disorder preferring generalized mood dysregulation disorder. Dr. Wolfgang, acknowledged Mother's cannabis dependence that may be in remission, and a personality disorder with antisocial and narcissistic features due to issues with authority, adherence to social norm and similar features. Ultimately, he opined that the Mother needed psychotherapy with a psychodynamic element as well as psychotropic medications to manage moods and behaviors; however, the prognosis for her showing significant long-term benefit from mental health treatment was guarded if not poor; years of various forms of treatment had not ameliorated her many issues to any appreciable extent.

{¶33} Dr. Wolfgang completed a second assessment to include observing the Mother with the children as well as observing the children in the two placements with their caregivers. CCJFS Exhibit 45. He noted that eye contact was shorter with the Mother and there was less connection or bonding than with the caregivers. Physical contact with the Mother was forced, strained, and not spontaneous which was markedly different than with the caregivers. Physical contact was freely done with the caregivers, not the Mother. The children were prone to seek out the visitation supervisor rather than the Mother for comfort at visitations. Dr. Wolfgang testified about his observations on January 26, 2022 when A.B.S. acted out angrily. His report notes that A.B.S. refused physical contact with the Mother and "angrily misbehaved as though to express his underlying feelings." Dr. Wolfgang stated A.B.S. appeared to be "seeking revenge for past wrongs against him." The twins also behaved in an equally challenging manner due to their energy and mischievous behavior. Mother responded in an inconsistent manner with no follow through. Dr. Wolfgang noted that Mother was not intervening and failed to provide

structure. His reports states that the children displayed "insecure avoidance pattern of attachment" with the Mother. He noted the presence of maladaptive parental behaviors.

**{¶34}** Mother presented the testimony of Jane Engott, LPCC (Licensed Professional Clinical Counselor) and LICDC (License Independent Chemical Dependency Counselor) with Coshocton Behavioral Health Choices (CBHC). 8T. at 1285-1286. She began seeing Mother July 1, 2020. 9T. at 1314. Her last session with Mother was a few days before Ms. Engott testified. Id. at 1315. Ms. Engott described the improvement Mother has made completing twenty-three sessions of anger management and fifty-two individual sessions with Ms. Engott. 9T. at 1317. Mother further completed twenty-three sessions of the Phase II addiction and recovery group, graduating on October 21, 2021. 9T. at 1358. This occurred after Mother had tested positive for marijuana in July-August 2021. Id. at 1357-1358.

**{¶35}** Ms. Engott's opinion was that Mother had been committed to the process, had done all requested, and had made progress. Ms. Engott found no evidence of PTSD. Id. at 1347. She disagreed with Dr. Wolfgang that generalized mood disorder is even a diagnosis. Id. 1347-1348. Ms. Engott found no evidence to support a diagnosis of personality disorder or narcissistic personality disorder. Id. at 1349. Ms. Engott testified based upon the factors set forth in the DSM-5. Id.

**{¶36}** Marissa McCleary a nurse practitioner with CBHC testified on Mother's behalf. Ms. McCleary specializes in both family medicine and psychiatric mental health. 9T. at 1381. Ms. McCleary is permitted to diagnose and treat mental health conditions. Id. at 1384. She is also permitted to prescribe medication. Id. at 1385. Ms. McCleary was qualified as an expert witness. Id.

{¶37} Ms. McCleary began seeing Mother June 1, 2020. 9T. at 1386; 1388. Mother was diagnosed with Bipolar disorder, adjustment disorder and anxiety. Id. at 1388. She has seen Mother fourteen times. Ms. McCleary testified that Mother seemed to be doing great as of her last appointment on March 8, 2022. 9T. at 1390. Ms. McCleary was surprised to learn that Mother had not picked-up her medication and would have been out of medication for nearly a month and a half. Id. at 1391. Mother presently was taking Seroquel, Trazodone and BuSpar. Id. at 1395. Mother was not up to date with her Seroquel and BuSpar. Id. Ms. McCleary agreed that Mother does not suffer from PTSD. 9T. at 1406. She further agreed that the DSM-5 does not list a generalized mood disorder. Id. at 1406. She would question whether the person making such a diagnosis was using the most current techniques and models. Id. at 1406-1407. She further disagreed that Mother met the diagnosis for personality disorder, antisocial personality disorder or narcissistic personality disorder. 9T. at 1406-1408; 1411. Ms. McCleary was aware that Mother had several positive drug screens for THC in July, 2021. 9T. at 1430.

{¶38} Mother also called her probation officer, Ross Nelson, to testify. He regarded Mother as being successful on her community control program, and she had been released early on December 9, 2021, after approximately sixteen months of a three-year sentence. On cross examination, he acknowledged Mother's failed drug screens during the months of February, March, July, and August 2021, and she admitted use in June 2021. He testified that many of the drug screens were strung back to back to the same use. 9T. at 1456. He was waiting on the THC to clear her system on some of those. Id.

{¶39} The Mother's final witness was Crystal Smucker, a counselor with First Step Family Violence Intervention Services, Inc. CCJFS referred Mother in September 2020 for healthy relations educational program. Mother attended as scheduled, was cooperative, willing to participate, open, and completed the program on December 16, 2020. Ms. Smucker had limited information regarding Mother's past history of domestic violence incidents, and her agency was not further involved in the case.

{¶40} Permanent Custody of M.A.P. and A.B.S. to CCJFS and Legal Custody of T.E.S. and A.E.S. to a non-relative kinship were granted by Entry Filed August 8, 2022.

*Assignments of Error*

{¶41} Mother raises five Assignments of Error:

{¶42} "I. THE JUVENILE COURT ERRED IN AND DENIED APPELLANT HER DUE PROCESS RIGHTS UNDER THE FEDERAL AND STATE CONSTITUTIONS BY DENYING HER THE FUNDS NEEDED TO OBTAIN THE SERVICES OF A PSYCHOLOGIST OF HER OWN CHOOSING TO ASSIST HER IN MEETING AND REBUTTING THE TESTIMONY OF THE PSYCHOLOGISTS SELECTED AND PAID FOR BY THE STATE.

{¶43} "II. THE TRIAL COURT ERRED IN NOT CONTINUING THE TRIAL IN ORDER FOR APPELLANT TO HAVE INDEPENDENT OBSERVATION OF HER PARENTING TIME WITH THE CHILDREN AND TO HAVE PARENTING TIME HELD AT A DIFFERENT LOCATION THAN FCFC.

{¶44} "III. THE TRIAL COURT ERRED IN FINDING BY CLEAR AND CONVINCING EVIDENCE THAT THE CHILDREN COULD NOT BE [sic.] REASONABLY BE PLACED WITH APPELLANT PURSUANT TO R.C. 2151.414 WHEN IT HELD THAT

THE AGENCY USED REASONABLE AND DILIGENT EFFORTS TO REUNIFY THE CHILDREN WITH APPELLANT.

**{¶45}** "IV.   THE TRIAL COURT ERRED IN NOT APPOINTING SEPARATE COUNSEL FOR THE CHILDREN AFTER IT CAME TO THE COURT'S ATTENTION THAT THERE WAS A POSSIBLE CONFLICT OF INTEREST BETWEEN THE CHILDREN'S WISHES AND THE GUARDIAN AD LITEM'S RECOMMENDATION.

**{¶46}** "V. THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT TERMINATED THE PARENTAL RIGHTS OF THE NATURAL FATHER OF A.B.S. ALTHOUGH FATHER (J.D.) WAS NEVER PROPERLY SERVED A COPY OF THE PERMANENT CUSTODY MOTION AND SUMMONS NOR WAS HE ADDED TO CASE PLAN."

I.

**{¶47}** In her First Assignment of Error, Mother contends that the trial court denied her due process of law because the trial judge did not appoint an independent psychologist to assist her in the preparation of her case.

**{¶48}** Juv.R. 32 provides, in relevant part,

(A) Social History and Physical or Mental Examination: Availability Before Adjudication.  The court may order and utilize a social history or physical or mental examination at any time after the filing of a complaint under any of the following circumstances:

(1) Upon the request of the party concerning whom the history or examination is to be made;

(2) Where transfer of a child for adult prosecution is an issue in the proceeding;

(3) Where a material allegation of a neglect, dependency, or abused child complaint relates to matters that a history or examination may clarify;

(4) Where a party's legal responsibility for the party's acts or the party's competence to participate in the proceedings is an issue;

(5) Where a physical or mental examination is required to determine the need for emergency medical care under Juv. R. 13; or

(6) Where authorized under Juv. R. 7(I).

{¶49} In *In re Stanley,* the Court of Appeals noted,

It is well-settled that the care, custody, and management of one's own children are fundamental rights. *Santosky v. Kramer* (1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599. To adequately protect these rights, due process requires "fundamentally fair procedures" when a state moves to destroy already weakened familial bonds. Id. at 754. A parent has a paramount right to the custody of his or her child over a non-parent. This interest is subordinate only to the best interest of the child. *In re Angelo* Brown (Nov. 26, 1986), Hamilton App. No. C-850878, unreported, *citing In re Perales* (1977), 52 Ohio St.2d 89.

Where the juvenile court grants the state's request for a psychological examination of an indigent parent to be performed by an examiner selected and paid by the state [FCCS], the parent is entitled to an expert of his or her own. Funds to employ her own psychologist should

have been awarded appellant in order to afford her a meaningful opportunity

to rebut the allegations of FCCS's expert.

10th Dist. Franklin No. 93AP-972, 1993 WL 512502 (Dec. 7, 1993), at *3.

{¶50} We note that constitutional errors are subject to a harmless error analysis. In the context of a criminal trial, the Ohio Supreme Court addressed the "harmless error" standard of review,

In general, "'a constitutional error does not automatically require reversal of a conviction.'" *Weaver v. Massachusetts*, —— U.S. ——, 137 S.Ct. 1899, 1907, 198 L.Ed.2d 420 (2017), *quoting Fulminante* at 306, 499 U.S. 279, 310, 111 S.Ct. 1246. For purposes of determining whether a conviction should be reversed, the Supreme Court has divided constitutional errors into two classes: "trial errors," which are reviewable for harmless error, and "structural errors," which are per se cause for reversal. *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 9, *citing Fulminante* at 306-312, 111 S.Ct. 1246, and *State v. Esparza*, 74 Ohio St.3d 660, 661, 660 N.E.2d 1194 (1996). Most constitutional errors are trial errors. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). Trial errors occur during "'presentation of the case to the jury' and their effect may 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt.'" (Brackets sic.) Id., *quoting Fulminante* at 307-308, 499 U.S. 279, 310, 111 S.Ct. 1246. A constitutional trial error is harmless when the state demonstrates "'beyond a reasonable

doubt that the error complained of did not contribute to the verdict obtained.'" *Weaver* at ——, 137 S.Ct. at 1907, *quoting Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

*State v. Montgomery,* 169 Ohio St.3d 84, 2022-Ohio-2211, 202 N.E.3d 616, ¶25.

**{¶51}** Although not appointed by the juvenile court judge, we note that Mother had the assistance of two expert witnesses, Jane Engott, and nurse practioner Marissa McCleary. As noted in our discussion of the *Facts and Procedural History,* both witnesses criticized Dr. Wolfgang's methodology and conclusions. Each witness also presented her own diagnosis of Mother's psychological make-up, Mother's compliance with treatment and her compliance with aspects of her case plan. Mother does not elucidate how having a third opinion would have change the outcome of the proceedings.

**{¶52}** We find any error in the juvenile judge's failure to appoint a psychological expert for Mother to be harmless beyond a reasonable doubt and did not affect the Mother's substantial rights.

**{¶53}** Mother's First Assignment of Error is overruled.

II.

**{¶54}** In her Second Assignment of Error, Mother argues the trial court erred in denying her a continuance. Specifically, Mother contends she filed a Motion for an Independent Observation of Mother's Supervised Visits on March 14, 2022, which was denied by Judgment Entry filed March 23, 2022. As refiled on March 22, 2022, with the addition of a motion to continue the trial to allow for six weeks of independent observation of Mother with the children, the motion was eventually partly granted for the independent observation; however, this was already during the final hearing which did not leave time

for Mother to establish a new parenting center.  The motion to continue the trial for six weeks was denied.

**{¶55}** The permanent custody hearing took place on the following dates: January 4, 2022; January 5, 2022; February 24, 2022; March 3, 2022; March 9, 2022; March 16, 2022; March 23, 2022; March 24, 2022; March 25, 2022; March 28, 2022; April 11, 2022; and, April 21, 2022.  In other words, from start to finish the hearing spanned over three months.  The trial court's Judgment Entry granting the independent observation and denying the continuance was filed April 5, 2022, some seventeen days before the conclusion of the hearing.

**{¶56}** In *Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), the Court considered the matter of granting a continuance under a due process analysis.  It said:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence....  Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality....  There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied...."

Id. at 589, 84 S.Ct. at 849.

{¶57} As detailed in the juvenile court's Judgment Entry filed August 8, 2022, Mother's cross-examination of the witnesses presented lasted in some instances over four hours. The court further noted over forty-one motions had been filed, the majority of which were filed during the months long permanent custody hearings.

{¶58} As the Ohio Supreme Court has recently explained,

> The term "abuse of discretion" connotes that "'the court's attitude is unreasonable, arbitrary or unconscionable.'" [*State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77] at ¶ 60, *quoting State v. Adams,* 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). Stated differently, an abuse of discretion involves more than a difference in opinion: the "'term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations.'" *State v. Jenkins*, 15 Ohio St.3d 164, 222, 473 N.E.2d 264 (1984), *quoting Spalding v. Spalding*, 355 Mich. 382, 384, 94 N.W.2d 810 (1959). For a court of appeals to reach an abuse-of-discretion determination, the trial court's judgment must be so profoundly and wholly violative of fact and reason that "'it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias.'" Id., *quoting Spalding* at 384-385, 94 N.W.2d 810.

*State v. Weaver,* Slip Op. 2022-Ohio-4371, ¶24 (Dec. 8, 2022).

{¶59} Mother's reasons for asking for the continuance were entirely speculative. Whether the testimony would have been favorable or unfavorable is a matter of conjecture. The trial court had an interest in controlling its own docket and ensuring the

prompt and efficient administration of justice.  *See Unger*, 67 Ohio St.2d at 67, 423 N.E.2d 1078.  The trial court clearly felt that Mother was adequately represented by competent counsel and that there was no reason to delay the hearings any further.  Unquestionably, the rescheduling of the trial six weeks in a case where the hearings had stretched three months would have involved some degree of inconvenience for the court and the witnesses.  Balanced against this is Mother's speculative desire to have a third party observe her interact with her children.

{¶60}  Mother has not demonstrated prejudice from the court's denial of her motion to continue, and the court did not abuse its discretion in overruling the motion.

{¶61}  Mother's Second Assignment of Error is overruled.

III.

{¶62}  In her Third Assignment of Error, Mother contends the trial court erred in finding by clear and convincing evidence that the children could not reasonably be placed with Mother pursuant to R.C. 2151.414 when it held that the agency used reasonable and diligent efforts to reunify the children with Mother.

**Standard of Appellate Review**

{¶63}  "[T]he right to raise a child is an 'essential' and 'basic' civil right."  *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169(1990), *quoting Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551(1972).  A parent's interest in the care, custody, and management of his or her child is "fundamental."  Id.; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599(1982).  The permanent termination of a parent's rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case."  I*n re Smith,* 77 Ohio App.3d 1, 16, 601 N.E.2d 45(6th Dist. 1991).

Therefore, parents "must be afforded every procedural and substantive protection the law allows." Id. An award of permanent custody must be based upon clear and convincing evidence. R.C. 2151.414(B)(1).

**{¶64}** The Ohio Supreme Court has delineated our standard of review as follows, "clear and convincing evidence" is "[t]he measures or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-104, 495 N.E.2d 23 (1986). In *Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954), the Supreme Court further cautioned,

> The mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts. The degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. *Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false.* See *Rice v. City of Cleveland*, 114 Ohio St. 299, 58 N.E.2d 768.

161 Ohio St. at 477-478. (Emphasis added). A court of appeals will affirm the trial court's findings "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re Adkins,* 5th Dist. Nos. 2005AP06–0044 and 2005AP07–0049, 2006-Ohio-431, 2006 WL 242557, ¶17.

## Requirements for Permanent Custody Awards

{¶65} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶66} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in

another state, and the child cannot be placed with either of the child's

parents within a reasonable time or should not be placed with the child's

parents;

     (b) the child is abandoned;

     (c) the child is orphaned and there are no relatives of the child who

are able to take permanent custody; or

     (d) The child has been in the temporary custody of one or more public

children services agencies or private child placing agencies for twelve or

more months of a consecutive twenty-two-month period, or the child has

been in the temporary custody of one or more public children services

agencies or private child placing agencies for twelve or more months of a

consecutive twenty-two-month period and, as described in division (D)(1) of

section 2151.413 of the Revised Code, the child was previously in the

temporary custody of an equivalent agency in another state.

**{¶67}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial

court must apply when ruling on a motion for permanent custody.  In practice, the trial

court will usually determine whether one of the four circumstances delineated in R.C.

2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding

the best interest of the child.

<h3 style="text-align:center">Temporary Custody for at least 12 out of a consecutive 22-month period-</h3>

<h3 style="text-align:center">R.C. 2151.414(B) (1) (d).</h3>

**{¶68}** The "12 of 22" provisions set forth in R.C. 2151.413(D)(1) and R.C.

2151.414(B)(1)(d) balance the importance of reuniting a child with the child's parents

against the importance of a speedy resolution of the custody of a child. *In re C.W.,* 104 Ohio St.3d 163, 2004–Ohio–6411, 818 N.E.2d 1176, ¶22. Through the "12 of 22" provisions in the permanent-custody statutes, the legislature provides parents with 12 months to work toward reunification before an agency can institute a permanent-custody action asserting R.C. 2151.414(B)(1)(d) grounds. Id.

{¶69} The children were removed from Mother's care on March 16, 2020. The motion for permanent custody was filed September 3, 2021, some 1 year and 5 months after CCJFS assumed custody. Accordingly, the trial court correctly found M.A.P. and A.B.S. had been in the temporary custody of the CCJFS for over twelve months of a consecutive 22-month period.

{¶70} As findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. *In re Daltoni*, 5th Dist. Tuscarawas No. 2007 AP 0041, 2007-Ohio-5805. This finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun*, 5th Dist. Stark No. 2008CA00118, 2008-Ohio-5458.

{¶71} Because Mother has not challenged the twelve of twenty-two-month finding as to M.A.P. and A.B.S., we would not need to address the merits of Mother's assignment of error. However, even if we consider Mother's arguments the trial court did not err in determining the children cannot be placed with Mother at this time or within a reasonable period of time.

**Parental Placement within a Reasonable Time– R.C. 2151.414(B)(1)(a)**

{¶72}  The court must consider all relevant evidence before determining the child cannot be placed with either parent within a reasonable time or should not be placed with the parents.  R.C. 2151.414(E).  The statute also indicates that if the court makes a finding under R.C. 2151.414(E)(1)-(15), the court shall determine the children cannot or should not be placed with the parent.  A trial court may base its decision that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent upon the existence of any one of the R.C. 2151.414(E) factors.  The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time.  *See In re William S.*, 75 Ohio St.3d 95, 1996–Ohio–182, 661 N.E.2d 738; *In re Hurlow*, 4th Dist. Gallia No. 98 CA 6, 1997 WL 701328 (Sept. 21, 1998); *In re Butcher,* 4th Dist. Athens No. 1470, 1991 WL 62145(Apr. 10, 1991).

{¶73}  R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents.  Specifically, Section (E) provides, in pertinent part, as follows:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence.  If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's

parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for changing parental conduct to allow them to resume and maintain parental duties.

* * *

(16) Any other factor the court considers relevant.

{¶74}  As set forth above, the trial court's findings are based upon competent credible evidence.  The record includes the recommendation of the guardian ad litem for the children, and the testimony of the witnesses at trial.  The trial judge was in the best position to determine the credibility of the witnesses.

{¶75}  The juvenile court found that CCJFS had made reasonable efforts to prevent the removal, to eliminate the continued removal, or to make it possible for M.A.P. and A.B.S. to return home safely to Mother's home.

**{¶76}** The record supports the juvenile court's finding that Mother has not shown consistent sustained progress to have the children returned to her custody. She has not consistently taken her prescribed medications. It does not appear that Mother has been able to apply any behavioral changes that she has attempted to learn. Despite offering numerous services, Mother was unable or unwilling to mitigate the concerns that led to the children's removal. As set forth in our *Facts and Procedural History, supra*, we find there was sufficient and substantial competent evidence Mother failed to remedy the problems which initially caused the removal of M.A.P. and A.B.S. from her home.

**{¶77}** A parent's successful completion of the terms of a case plan is not dispositive on the issue of reunification. The ultimate question under R.C. 2151.414(A)(1) is whether the parent has substantially remedied the conditions that caused the child's removal. *In re Shchigelski*, 11th Dist. Geauga No. 99–G–2241, 2000 WL 1568388 (Oct. 20, 2000); *In re McKenzie*, 9th Dist. Wayne No. 95CA0015, 1995 WL 608285(Oct. 18, 1995). A parent can successfully complete the terms of a case plan yet not substantially remedy the conditions that caused the children to be removed—the case plan is simply a means to a goal, but not the goal itself. Hence, the courts have held that the successful completion of case plan requirements does not preclude a grant of permanent custody to a social services agency. *In re J.L.,* 8th Dist. No. 84368, 2004–Ohio–6024, ¶ 20; *In re Mraz*, 12th Dist. Nos. CA2002–05–011, CA2002–07–014, 2002–Ohio–7278. In the case of *in re: Summerfield*, 5th Dist. Stark No. 2005CA00139, 2005-Ohio-5523, this Court found where, despite marginal compliance with some aspects of the case plan, the exact problems that led to the initial removal remained in existence, a court does not err in finding the child cannot be placed with the parent within a reasonable time.

**{¶78}** The evidence demonstrated the very little successful efforts Mother had made on the case plan. On that point, the evidence demonstrates that any improvement that Mother has made in her life is tentative and, perhaps, temporary, and that she is at risk of relapse. The trial court found that Mother is not able to be a successful parent to the children.

**{¶79}** We find there is competent and credible evidence to support the trial court's determination that M.A.P. and A.B.S. cannot be placed with Mother within a reasonable time or should not be placed with Mother.

### Reasonable Efforts

**{¶80}** Mother further contends the finding that CCJFS made reasonable efforts to reunify the children with Mother is against the manifest weight of the evidence.

**{¶81}** The Supreme Court of Ohio in in *re C.F.*, 113 Ohio St.3d 73, 78, 862 N.E.2d 816, 821(2007) noted,

> [N]o one section of the Revised Code addresses the concept of reasonable efforts. Overall, Ohio's child-welfare laws are designed to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.' R.C. 2151.01(A). To that end, various sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit. For example, R.C. 2151.412 requires the agency to prepare and maintain a case plan for children in temporary custody with the goal 'to eliminate with all due speed the need for the out-of-home placement so that the child can safely return

home.'    Under R.C. 2151.413(D)(3)(b), an agency may not file for permanent custody under R.C. 2151.413(D) - the '12 months out of 22 rule'- '[i]f reasonable efforts to return the child to the child's home are required under section 2151.419' and the agency has not provided the services required by the case plan.

{¶82}  A "reasonable effort" is "* * * an honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage."  *In re Weaver*, 79 Ohio App.3d 59, 63, 606 N.E.2d 1011(12th Dist. 1992).  The issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case.  *In re J.D.*, 3rd Dist. Hancock Nos. 5-10-34, 2011-Ohio-1458.  The child's health and safety is paramount in determining whether reasonable efforts were made.  *In re R.P.*, 5th Dist. Tuscarawas No. 2011-Ohio-5378.

{¶83}  R.C. 2151.419 requires the trial court to determine whether the agency filing the complaint for custody "has made reasonable efforts * * * to eliminate the continued removal of the child from his home, or to make it possible for the child to return home." Subsection (B)(1) mandates the trial court to issue written findings of fact setting forth the reasonable efforts made by the agency, including a brief description of "the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from his home or enable the child to return home."

{¶84}   However, even where a trial court has failed to include in its judgment entry, the findings contemplated by R.C. 2151.419(B)(1) we have found that the ultimate issue is the reasonableness of the Department's efforts, and have concluded those efforts may

be determined from the record. *In the matter of Kell/Bess Children*, 5th Dist. No. 97CA0278, 1998 WL 401767(Mar. 23, 1998); *Hunt v. Ickes*, 5th Dist. Tuscarawas No. 2014 AP 08 0032, 2015-Ohio-309, ¶19.

{¶85}  We find there is competent and credible evidence to support the trial court's determination that CCJFS efforts were reasonable and diligent under the circumstances of the case.   We find that the record supports that CCJFS was working toward the goal of reunification.  We find no evidence of dishonest purpose, conscious wrongdoing, or breach of duty on the part of CCJFS.

{¶86}   Having reviewed the record, we find that CCJFS made a good faith effort to reunify Mother and her children.  Furthermore, the record contains clear and convincing evidence to support the court's determination that the children could not be placed with Mother.

**The Best Interest of the Children**

{¶87}   An agency that seeks permanent custody of a child bears the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest.  *In re B.C.,* 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 26.

{¶88}  R.C. 2151.414(D) requires the trial court to consider all relevant factors in determining whether the child's best interests would be served by granting the permanent custody motion.  These factors include but are not limited to: (1) the interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be

achieved without permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) apply.

{¶89} The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent's having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; a parent's withholding medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated.

{¶90} No one element is given greater weight or heightened significance. *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816. R.C. 2151.414(D)(1) does not require a juvenile court to make specific findings regarding each best-interest factor listed in R.C. 2151.414(D)(1) or to include in its decision or judgment entry a written discussion of each of those factors. *In re: A.M.,* 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶33.

{¶91} A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Mauzy Children,* 5th Dist. No. 2000CA00244, 2000 WL 1700073 (Nov. 13, 2000), *citing In re Awkal,* 85 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist. 1994).

**{¶92}** In the case at bar, CCJFS attempted to find relative placement for each child; however, their efforts were not successful.

**{¶93}** The witnesses testified as to the minor children avoiding physical contact with the Mother and showing anxiety and getting clingy relating to visitations. Both M.A.P. and A.B.S. are in counseling due to trauma relating to the Mother. A.B.S. started counseling following the GAL recommending the same due to emotional damage caused at visitation with the Mother. The minor children herein are more attached to their placements than to any of the biological parents, their behavior indicates they wish to stay in their placements, and they have been in the care of the agency (M.A.P. and A.B.S.) or placement (A.E.S. and T.E.S.) for the majority of their lives.

**{¶94}** Finally, the Guardian ad Litem recommended that the permanent custody of the children be granted to the Agency.

**{¶95}** In short, the juvenile court's judgment entry demonstrates that the court satisfied its statutory duty to consider the best interest factors set out in R.C. 2151.414(D)(1)(a) through (e).

**Conclusion**

**{¶96}** Having reviewed the record, we find that CCJFS made a good faith effort to reunify Mother and her children. Furthermore, the record contains clear and convincing evidence to support the court's determination that M.A.P. and A.B.S. could not be placed with Mother.

**{¶97}** We find that the trial court's determination that Mother had failed to remedy the issues that caused the initial removal and therefore the children could not be placed with her within a reasonable time or should not be placed with her was based upon

competent credible evidence and is not against the manifest weight or sufficiency of the evidence.

**{¶98}** We further find the trial court correctly found that the children had been in the temporary custody of the CCJFS for over twelve months of a consecutive 22-month period.

### Legal Custody and the Best Interest of the Children – T.E.S. & A.E.S.

**{¶99}** The award of legal custody is "not as drastic a remedy as permanent custody." *In re L.D.*, 10th Dist. Franklin No. 12AP-985, 2013-Ohio-3214. This is because the award of legal custody does not divest parents of their residual rights, privileges, and responsibilities. *In re C.R.,* 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188.

**{¶100}** Before awarding legal custody to a non-parent, a trial court must ordinarily make a finding that each parent is unsuitable. *In re L.P.,* 5th Dist. Muskingum No. CT2016-0045, 2017-Ohio-52, *citing In re Hockstock*, 98 Ohio St.3d 238, 2002-Ohio-7208. This requirement does not apply, however, in cases involving abuse, neglect, or dependency. Id. The Ohio Supreme Court has held that, "[a] juvenile court adjudication of abuse, neglect, or dependency is a determination about the care and condition of a child and implicitly involves a determination of the unsuitability of the child's custodial and/or noncustodial parents." *In re C.R.,* 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188. Thus, "[w]hen a juvenile court adjudicates a child to be abused, neglected, or dependent, it has no duty to make a separate finding at the dispositional hearing that a noncustodial parent is unsuitable before awarding legal custody to a nonparent." Id. In this case, the child was adjudicated abused. R.C. 2151.353(A) states, in pertinent part,

If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:

* * *

(3) Award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings * * *.

{¶101} A trial court "must have wide latitude in considering all the evidence" and a custody decision will not be reversed absent an abuse of discretion. *Davis v. Flickinger*, 77 Ohio St.3d 415, 674 N.E.2d 1159, *citing Miller v. Miller*, 37 Ohio St.3d 71, 523 N.E.2d 846 (1988). As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent, and credible evidence upon which the finder of fact could base its judgment. *Cross Truck Equip. Co. v. The Joseph A. Jeffries Co.*, 5th Dist. Stark No. CA5758, 1982 WL 2911 (Feb. 10, 1982). Accordingly, judgments supported by some competent and credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶102} Unlike in a permanent custody proceeding where a juvenile court's standard of review is by clear and convincing evidence, the standard of review in legal custody proceedings is a preponderance of the evidence. *In re S.D.,* 5th Dist. Stark Nos. 2013CA0081, 2013CA0082, 2013-Ohio-5752.

{¶103} Issues relating to the credibility of the witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility "is crucial in a child custody case, where there may be as much evidence in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 674 N.E.2d 1159.

{¶104} The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, and a trial court must base its decision on the best interest of the child. *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188; *In re P.S.*, 5th Dist. Stark No. 2012CA00007, 2012-Ohio-3431. When determining the issue of legal custody, the trial court should consider the totality of the circumstances. *In re D.T.*, 5th Dist. Stark No. 2013CA00252, 2014-Ohio-2495. Trial courts should consider all factors relevant to the best interest of the child. Id. This may include the best interest factors contained in R.C. 2151.414(D) and/or R.C. 3109.4(F), including: the wishes of the child (expressed to the court or through the GAL) and the child's parents; the child's interactions and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child; the custodial history of the child; the child's need for a legally secure placement; the child's adjustment to their home, school, and community; the mental and physical health of all persons involved in the situation; and the person more likely to facilitate court-approved parenting time rights or visitation.

{¶105} The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent's having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived

in the parent's household; a parent's withholding medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated.

{¶106} No one element is given greater weight or heightened significance. *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816. R.C. 2151.414(D)(1) does not require a juvenile court to make specific findings regarding each best-interest factor listed in R.C. 2151.414(D)(1) or to include in its decision or judgment entry a written discussion of each of those factors. *In re: A.M.,* 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶33.

{¶107} In the case sub judice, Mother made minimal progress toward completion of portions of her case plan, but the primary goal is not to simply complete the case plan. *In re T.H.,* 5th Dist. Muskingum No. CT2016-0009, 2016-Ohio-7312, ¶ 42. Even the successful completion of a case plan is not dispositive on the issue of reunification. *In re W.A.J.*, 8th Dist. Cuyahoga No. 99813, 2014-Ohio-604. Where a parent has participated in his or her case plan and completed most or all the plan requirements, a trial court may still properly determine that such parent has not substantially remedied the problems leading to agency involvement. *In the Matter of A.L. and J.L.*, 5th Dist. Guernsey No. 11 CA 23, 2012-Ohio-481. While it may be in Mother's best interest to complete the case plan, this is only one factor for a trial court to consider in the best interest of the child, and, "in legal custody cases, trial courts should consider all factors relevant to the best interest of the child." *In the Matter of D.P. and G.P.,* 5th Dist. Stark No. 2010CA00348, 2011-Ohio-1907.

{¶108} The issue in this case is whether the preponderance of the evidence demonstrated it was in the best interest of T.E.S. and A.E.S. to grant legal custody to T.K.

{¶109} In the case at bar, T.K. testified that T.E.S. and A.E.S. moved into her home on October 7, 2020 and have resided there continuously since that time.  She noted that the children are more emotional and agitated following visitations with Mother.  She confirmed that she and the foster parents for M.A.P. and A.B.S.  both now and in the future will work to maintain the relationship between all four boys.  T.K. testified that she and T.E.S. and A.E.S. are family, bonded, and love each other.  She is willing to comply with court orders relating to the parents' visitation/parenting time schedule.

{¶110} Based on the foregoing, we find the trial court did not commit error in awarding legal custody of T.E.S. and A.E.S. to T.K.

{¶111} Mother's Third Assignment of Error is overruled.

IV.

{¶112} In her Fourth Assignment of Error, Mother contends the juvenile court erred in not appointing separate counsel for the children after it came to the court's attention that there was a possible conflict of interest between the children's wishes and the guardian ad litem's recommendation.

**Standard of Appellate Review**

{¶113} A guardian ad litem [GAL] can, in some situations, serve a dual role as both the guardian ad litem and the child's attorney, see Juv.R. 4(C) and R.C. 2151.281(H), and thereby fulfill the child's right to counsel, provided there has been an express dual appointment by the juvenile court. *In re Williams,* 101 Ohio St.3d 398, 2004-Ohio-1500,

805 N.E.2d 1110, ¶18, *citing In re Duncan/Walker Children*, 109 Ohio App.3d 841, 844–845, 673 N.E.2d 217(5th Dist. 1996).

{¶114} Sup.R. 48.02(D)(1) and Juv. R. 4(C) require a trial court to appoint a separate attorney to represent a child in cases where the wishes of the child differ from the recommendation of the GAL.

{¶115} The determination of whether a conflict of interest exists between the GAL and the child is a legal issue that we review de novo. *In re Qu. W., 11*th Dist. Ashtabula No. 2015-A-0016, 2015-Ohio-2202, ¶61, *citing, In re McLean*, 11th Dist. Trumbull No. 2005–T–0018, 2005–Ohio–2576, ¶ 54.

**Issue for Appellate Review:**  *Whether the juvenile court erred as a matter of law in failing to appoint separate counsel for the children*

{¶116} In the case at bar, in over 1700 pages of transcripts, and 41 motions and rulings thereon, Mother is only able to point to the following exchange in support of her argument that a conflict existed,

> [GAL]:  The last preliminary issue I would like to address is the one regarding [M.A.P.] having a potential conflict of interest.  Your Honor, I have been in correspondence with Sarah at FCFC this morning.  The information I have is that [M.A.P.] is seeking to go with his placement [K.Y.]  who he is referring to as Mom, and seeking to leave the room, getting his coat, and [A.B.S.]'s coat and, in fact, leaving the visit early for that purpose.

1T. at 25.  [Appellant's brief at 15].   Mother herself notes that the child's statement is ambiguous, "The record is not clear as to his wishes.  Other interpretations include him

wanting to leave with appellant and go somewhere other than the one room visitation center."  Appellant's brief at 15.

{¶117} Generally, the appointment of independent counsel is warranted when a child has "repeatedly expressed a desire" to remain or be reunited with a parent but the child's guardian ad litem believes it is in the child's best interest that permanent custody of the child be granted to the state.  *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110, ¶¶ 5-6

{¶118} Courts have recognized,

> [T]he desire by a child to see his or her parent does not equate to a desire to live in that parent's household.  *In re A.T.,* 2006-Ohio-3919, at ¶ 61, citing I*n re G.C.* 8th Dist. No. 83994, 2004-Ohio-5607, ¶ 9.  We have similarly recognized that "the presence of parent/child bonding is not the same thing as making a knowing choice to remain with one parent." *In re A. T.*, 2006-Ohio-3919, at ¶ 61, *quoting In re M.W.*, 8th Dist. No. 83390, 2005-Ohio-1302, at ¶ 12.  The mere fact that a child enjoys seeing his or her parent at visitation is not, therefore, in conflict with a recommendation for permanent custody by a guardian ad litem.  *See In re A. T.*, 2006-Ohio-3919, at ¶ 61.

*In re J.B.,* 9th Dist. Summit No. 23436, 2007-Ohio-620, ¶23.

{¶119} Clearly, this is not a case where the children have consistently and repeatedly expressed a desire to be with Mother.  We find that the comments cited by the Mother do not present a conflict of interest for the GAL.  Instead we find that these comments are the consequence of the immaturity, mental health issues and trauma

suffered by the child and cannot be interpreted as a consistent or repeated desire for a result that conflicts with the GAL's recommendation regarding the children's best interest.

**{¶120}** Mother's Fourth Assignment of Error is overruled.

V.

**{¶121}** In her Fifth Assignment of Error, Mother argues the trial court erred in terminating the parental rights of "the natural father of A.B.S." without proper notice.

**{¶122}** In *Iden v. Zumbro,* 5th Dist. Licking No. 18-CA-56, 2019-Ohio-1051, this Court held,

> Our Brethren in the Third, Fourth, Sixth and Ninth Districts have held a judgment entered by a juvenile court against a mother is not rendered void due to the alleged lack of service on the non-party father. *See In re Cook*, 3d Dist. No. 5–98–16, 1998 WL 719524 (Oct. 8, 1998) (mother does not have standing to raise issue of father's service on appeal); *In re Kincaid*, 4th Dist. No. 00CA3, 2000 WL 1683456 (Oct. 27, 2000); (mother had no standing to raise the issue of the trial court's personal jurisdiction over the father when there is no evidence that her defense was prejudiced by the absence of the father from the proceedings); *In re I.J.*, 6th Dist. Lucas No. L-12-1306, 2013-Ohio-1083, 2013 WL 1190822 (lack of service on father did not render the lower court's ruling relative to mother void for lack of jurisdiction); *In re Jordan*, 9th Dist. Nos. 20773, 20786, 2002 WL 121211 (Jan. 30, 2002) (mother lacks standing to raise service issue unless she demonstrates she was "actually prejudiced" by the error). In the absence of a showing of prejudice to her case, an appellant mother cannot raise the

claimed lack of service on the putative father as error on appeal. *In re: I.J.,*
supra at ¶ 11.

Appellant must demonstrate the alleged failure to perfect timely
service upon Father resulted in actual prejudice to her. *In re A.M.*, 9th Dist.
No. 26141, 2012-Ohio-1024, 2012 WL 849641, ¶ 18. As we noted supra,
Father was served by publication although Appellant asserts such service
was defective because an affidavit confirming service by publication was
not filed with the court prior to the hearing and the newspaper never filed an
affidavit. Assuming, arguendo, Father was not served, we find Appellant
has offered no evidence of actual prejudice to her as a result. Accordingly,
we find Mother lacks standing to assert error in regard to service upon
Zumbro.

2019-Ohio-1051, ¶10-11. *Accord, In re D.R. & T.R.,* 5th Dist. Licking Nos. 2020 CA000
24, 2020 CA 00025, 2020-Ohio-4025, ¶23-24.

{¶123} J.C. who is listed as "Father" on A.B.S.'s birth certificate testified that he
was present for the birth of the child. 10T. at 1531. He further testified that J.D. never
called or contacted the Mother at any time. Id. at 1556. No evidence was presented that
J.D. was made aware that he has a child, or that he has ever taken any interest in the
child. Mother does not even know of J.D.'s present whereabouts.

{¶124} Mother has neither alleged nor demonstrated she was "actually prejudiced"
by the failure to join J.D. as a party or to perfect service upon him.

{¶125} Mother's Fifth Assignment of Error is overruled.

{¶126} The judgment of the Coshocton County Juvenile Court is affirmed.

By Gwin, P.J.,

Hoffman, J., and

King, J., concur.